# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
LORI ANN BOURINOT,                      )
      Plaintiff,              )
                                        )
      v.                      )    **CIVIL ACTION**
                                        )    **NO. 14-40016-TSH**
CAROLYN W. COLVIN,                      )
Commissioner of Social Security,        )
                                        )
      Defendant.              )
_____ )


## ORDER AND MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 11) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 15)

### March 30, 2015

HILLMAN, D.J.

      This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner" or "SSA") denying the application of Lori Ann Bourinot ("Plaintiff") for Social Security Disability Insurance Benefits and Supplemental Security Income. Plaintiff has filed a motion for judgment on the pleadings (Docket No. 11), and the Commissioner has filed a cross-motion seeking an order affirming the decision of the Commissioner (Docket No. 15). For the reasons set forth below, Plaintiff's motion is ***denied*** and Defendant's motion is ***granted***.

### Procedural History

      On November 7, 2011, Plaintiff filed concurrent applications for disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. *Social Security Administration Record of Social Security*

*Proceedings*, Docket No. 8, at 32 (hereinafter "(R. __)"). Plaintiff alleges that she has been disabled since March 1, 2009, on the basis of her post-traumatic stress disorder ("PTSD"), depression, anxiety, fibromyalgia and arthritis. (R. 220). The SSA initially determined that Plaintiff was not entitled to disability insurance benefits or supplemental security income on March 9, 2012, and affirmed the decision upon reconsideration on August 2, 2012. (R. 220-25, 227-32). Plaintiff requested an administrative hearing on August 22, 2012, and a hearing was held before Administrative Law Judge ("ALJ") Paul Carter on July 23, 2013. (R. 233, 60-93). In a written decision issued on August 7, 2013, the ALJ determined that Plaintiff was not disabled and therefore ineligible for disability insurance benefits and supplemental security income. (R. 29-59). The Appeals Council denied Plaintiff's request for review of the decision on September 4, 2013, thereby making it the final decision of the Commissioner. (R. 28). Plaintiff filed this action on February 7, 2014.

## Facts

### *Personal and Employment History*

Plaintiff was born on July 25, 1965, making her 43 years old on the date of alleged onset of disability. (R. 65). She is a high school graduate, and completed nursing school in 1996. (R. 68). Her only past relevant work was as a registered nurse. (R. 87).

### *Medical Records*

The records detailing Plaintiff's medical treatment for PTSD, depression, anxiety, fibromyalgia and arthritis are from two primary sources: Newton-Wellesley Hospital and Union Square Family Health Center.

*Newton-Wellesley Hospital Records*

Plaintiff treated with primary care physician Dayna Anderson, M.D. at Newton-Wellesley Hospital since at least 2004. (R. 1363-64). At a routine physical on March 11, 2009, Plaintiff was prescribed Celexa and Xanax for anxiety and Ambien for insomnia. (R. 880). The treatment notes also indicate that Plaintiff was prescribed medication for arthritis through an outside facility. *Id.*

In March 2010 Plaintiff was admitted to the emergency room at Newton-Wellesley Hospital for treatment of a back injury after falling off the back of her boyfriend's motorcycle. (R. 585). She was diagnosed with a contusion of the left back and buttock, as well as pneumonia. (R. 578). She was discharged with a prescription for vicodin and ibuprofen. (R. 594). At a follow-up appointment with Dr. Anderson on March 12, 2010, Plaintiff indicated that she still had significant tenderness and pain while rolling over in bed, but felt better while walking. (R. 594). At a second follow-up on March 24, Plaintiff complained of worsening lower back pain. (R. 611). She was referred to an orthopedist, Dr. Kenneth Polivy, M.D., who diagnosed her with lumbar mechanical back pain and provided Plaintiff with a back brace to wear as needed. (R. 615). A subsequent MRI indicated that Plaintiff had sustained a transverse sacral fracture at the S2-S3 level. (R. 613-14).

On May 16, 2010, Plaintiff was treated at the Newton-Wellesley emergency room following a fall down a flight of stairs. (R. 620). Plaintiff had been drinking and sustained an injury to her head and scalp, but was discharged the same day with instructions to ice the sore area for 20 minutes at a time. (R. 622). Plaintiff returned to the emergency room on July 3, 2010, for treatment of a bruised right eye and swollen cheek bone. (R. 498-501). Plaintiff stated that she suffered the injury while playing volleyball and denied domestic abuse. (R. 499). Plaintiff's

right eye was swollen, vision was blurry, and she had abrasions on one of her knuckles and left elbow. *Id.* She was diagnosed with facial fractures and referred to a maxilo-facial specialist. (R. 510).

On July 30, 2010, Plaintiff was seen in the Newton-Wellesley psychiatry department by Dr. Sharon Salter, M.D., to establish treatment for Plaintiff's anxiety and situational stress. (R. 674). Plaintiff reported a history of physical, verbal and sexual abuse by her ex-husband. *Id.* She also reported that she lost custody of her daughter, which prompted a suicide attempt in December 2009.[1] *Id.* Plaintiff stated that her mood, sleep, and energy were "ok," and her appetite was good. *Id.* Dr. Salter remarked that she did not appear to be an imminent danger to herself or others at the time. *Id.* Plaintiff was diagnosed with mood disorder, anxiety, PTSD, and had a global assessment functioning ("GAF") score of 55.

At a follow-up appointment with Dr. Salter on August 16, 2010, Plaintiff reported that she was upset about custody issues with her daughter. (R. 676). She described her mood as "sad most of the time," and stated that she suffers mild panic attacks. However, her anxiety was manageable and her sleep was "ok with Seroquel." *Id.* Dr. Salter noted that Plaintiff was alert and oriented, her appearance and speech were normal, and her GAF was 50. *Id.* During a visit on September 16, 2010, Plaintiff reported worsening symptoms. (R. 678). She stated that she had not gotten out of bed for the last three weeks following a job offer being rescinded. *Id.* Plaintiff's sleep was "horrible" and the prescribed medication was no longer working. *Id.* She said that she enjoys going out with her boyfriend at night but during the day she does not leave the house. *Id.* Dr. Salter noted that Plaintiff's affect seemed down and reserved, but she otherwise presented as normal. *Id.* Her GAF was 45. *Id.*

---

[1] Plaintiff was admitted to Heywood Hospital following her 2009 suicide attempt. The records from her treatment at Heywood are also part of the administrative record. (R. 386-476, 1166-1255).

Plaintiff was admitted to the Newton-Wellesley emergency room on September 23, 2010 for facial fractures and other injuries sustained in an assault by her boyfriend. (R. 490). She was discharged the same day with instructions to apply ice to the affected areas, and to follow up with her facial plastic surgeon, Dr. Jaimie DeRosa, M.D.[2] Plaintiff reported the assault to Dr. Salter in her next visit on October 1, 2010. (R. 680). Dr. Salter noted that Plaintiff had surgery the previous day to repair her broken facial bones. *Id.* Plaintiff stated that she had not previously mentioned the domestic abuse because she "did not want to admit that it was happening to her again." *Id.* Despite what had happened, Plaintiff reported feeling much better than her last visit. *Id.* She was having anxiety but felt safe now that her ex-boyfriend was in jail. *Id.* Although she was still sad, and was not sleeping well, she felt less depressed. *Id.* Dr. Salter noted that Plaintiff's affect was slightly reserved but she otherwise presented as normal, and had a GAF of 55. *Id.* Dr. Salter continued Plaintiff on her Celexa prescription, and also prescribed Lorazepam for anxiety and Ambien for insomnia. (R. 681). Plaintiff's Trazodone prescription was discontinued because it made her groggy. *Id.*

Plaintiff continued to see Dr. Salter regularly over the course of the next year and a half. On October 19, 2010, Plaintiff reported that her mood, energy, and appetite had improved, but she still had trouble sleeping. (R. 682). She had begun a hobby of breeding birds, and was considering doing it as a business. *Id.* She stated that she had been making to-do lists and completing ninety percent of her tasks. *Id.* Dr. Salter adjusted Plaintiff's Lorazepam and Ambien prescriptions. (R. 683). Plaintiff had a GAF of 65. *Id.* On November 22, 2010, Plaintiff reported a worsening mood, anxiety, difficulty sleeping, decreased energy and poor appetite. (R. 684). Plaintiff stated that her anxiety was made worse by situational stress related to her ex-boyfriend

---

[2] Medical records from Plaintiff's recurring treatment with Dr. DeRosa are also included in the administrative record. (R. 640-72, 710-844, 1386).

and custody issues with her daughter. *Id.* Dr. Salter prescribed Wellbutrin. (R. 685). Plaintiff had a GAF of 55. *Id.*

On December 20, 2010, Plaintiff reported to Dr. Salter that it had been a "bad month," due to situational stress regarding her daughter and ex-boyfriend. (R. 686). However, her mood was better and her appetite was good. *Id.* She said she had been more active and "is doing more things now," such as taking care of her birds, cooking, and other chores around the house. *Id.* Still, though, Plaintiff said she lacked motivation and "has to force herself to get out of the house." *Id.* Dr. Salter increased Plaintiff's dosage of Wellbutrin. (R. 687). Plaintiff's GAF was 60. *Id.* On January 19, 2011 Plaintiff stated that her mood was "ok" and that she was getting out of bed more, but her sleep was still not good. (R. 688). She said was feeling better than in the past, and had a GAF of 65. (R. 688-89). She was continued on existing medications. (R. 689). On February 15, 2011 Plaintiff reported continued situational stress, a good appetite, and that her sleep was "broken." (R. 690). She felt the Lorazepam was no longer effective, and Dr. Salter discontinued the prescription. (R. 691). Plaintiff's GAF was 65 and she was prescribed Diazepam. *Id.* On March 8, 2011, Plaintiff again reported situational stress, her mood was anxious, and her sleep was "off and on." (R. 692). Her GAF was still 65. *Id.* On April 29, 2011, Plaintiff reported that she was feeling better and therefore decided to self-taper off some of her medications. (R. 694). Her anxiety was "a little here and there," and sleep was "iffy." *Id.* Dr. Salter noted that Plaintiff seemed stable. *Id.* Plaintiff's GAF was 65. (R. 695).

On June 24, 2011, however, Plaintiff stated that her mood was not good and that she was spending 4-5 days per week in bed. (R. 696). She would get out of bed only to feed her birds or spend time with her boyfriend. *Id.* Dr. Salter noted that her worsened mood coincided with a decrease in the medications she was taking. *Id.* Plaintiff's GAF was 55, and she was restarted on

Ambien and Wellbutrin. (R. 697). On July 15, Plaintiff saw Dr. Salter and the increased medication appeared to be helping. (R. 698). Her mood was "ok," anxiety was "so/so," and sleep was "not good." *Id.* Her GAF was 65. *Id.* At appointments with Dr. Salter in August and October 2011, Plaintiff reported more of the same and was continued on existing medications. (R. 700-703). In December 2011, Plaintiff stated that her mood was "extremely bad" and her anxiety had increased. (R. 704). However, she also said that she felt her medication was effective and planned to continue the current regimen. *Id.* Her GAF was 60. (R. 705).

Plaintiff was last seen by Dr. Salter in January and March of 2012. On January 10, Plaintiff reported situational stress regarding her son's incarceration and custody issues with her daughter. (R. 706). Her mood was "ok, not great," and she was not sleeping well due to anxiety over her daughter. *Id.* She had a good appetite, and was able to leave the house to go to appointments and go out with her boyfriend for activities like playing pool. *Id.* Plaintiff wanted to continue with her current medication regimen, and her GAF was 65. (R. 707). On March 6, Plaintiff stated that her mood was "sometimes . . . ok, sometimes . . . not." (R. 708). She reported continued situational stress, and that she spends a lot of time in bed because she has nothing to do. *Id.* She had been having some suicidal ideation, but said she would never act on those thoughts. *Id.* Her GAF was 60. (R. 709).

Plaintiff saw Dr. Anderson for a physical exam on August 23, 2011. (R. 872-73). Dr. Anderson noted that Plaintiff was in counseling due to her history as a domestic abuse victim, and would likely need counseling indefinitely. *Id.* Dr. Anderson also observed that Plaintiff was seeing her psychiatrist regularly for medication. *Id.*

*Union Square Family Health Center Records*

Plaintiff has treated with multiple providers at Union Square Family Health Center since 2011. The earliest Union Square records indicate that she saw primary care physician Jonathan Burns, M.D., on November 5, 2011, complaining of abdominal pain. (R. 937). It was noted that Plaintiff had a fifteen year history of domestic abuse and was seeing Dr. Salter for her depression and anxiety. *Id.* During several visits with Dr. Burns and other providers, Plaintiff complained of situational stress related to her children, poor sleep, inability to leave the house, and low energy. (R. 936-955). She also reported persistent lower back pain. *Id.* However, Dr. Burns consistently found her depression and fibromyalgia to be "stable." (R. 938, 943, 945-46, 949, 951-52, 955-56, 1340-42). In June of 2012, Plaintiff reported to Dr. Burns that her fibromyalgia was doing well on her current medication, and she was feeling well. (R. 1338). In July she stated that she was feeling well and her fibromyalgia was feeling better overall (R. 1341).

At her visit with Dr. Burns on April 3, 2012, Plaintiff reported that she was injured during an altercation with her son. (R. 956). Dr. Burns referred Plaintiff for short-term crisis counseling with therapist Zorangeli Ramos, Ph.D. (R. 958-59). Plaintiff began her counseling with Dr. Ramos on April 19, 2012. (R. 1301). She complained of situational stress related to her son and ex-husband. (R. 956). She described difficulty sleeping, poor appetite, low energy and interest, nightmares, feelings of guilt, and depressed and anxious mood. (R. 957). She was diagnosed with depression and anxiety and had a GAF of 51. Over the course of three sessions, Dr. Ramos attempted to discuss and normalize Plaintiff's emotional difficulties in light of her trauma history. (R. 1301). The treatment also involved safety planning given Plaintiff's tendency to self-harm, and Dr. Ramos remarked that Plaintiff would continue to benefit from continued psychotherapy and medication. (R. 1302).

At primary care visits in August and October of 2012, Plaintiff complained of depression and insomnia but her condition appeared generally stable. (R. 1343-45). In November it was noted that Plaintiff had longstanding depression related to "life circumstances" and was battling chronic pain; however, the provider noted that she "seems pretty stable at this point." (R. 1346-47). She was continued on her prescriptions for Ambien, Celexa, and Wellbutrin, and discontinued on Valium. *Id.*

Plaintiff began seeing a new primary care physician, Rachel Vogel, M.D., on January 3, 2013. At her first visit Dr. Vogel noted that Plaintiff was alert and oriented and in no apparent distress. (R. 1355). On February 6, 2013, Plaintiff reported that she was still feeling very depressed, and requested refills for Valium, Celexa, Wellbutrin and Ambien. (R. 1357). On March 12, 2013, Plaintiff stated that her anxiety was still high and she was very upset about a dispute with her landlord over the condition of her housing. (R. 1360). She remarked that she was spending most of her time in the bedroom and had been canceling appointments because she didn't feel like going. *Id.* Plaintiff was continued on Ultram for her fibromyalgia, and Dr. Vogel tried to impress upon Plaintiff the importance of seeing Dr. Winters, a psychiatrist at Union Square. (R. 1360).

### *Medical Opinion Evidence*

The record also includes opinions of several doctors and health professionals who have treated, examined, or reviewed Plaintiff's medical conditions. The relevant opinions are summarized below.

### *Opinion of Scott Andrews, Ph.D.*

On April 21, 2010, Dr. Scott Andrews, a psychologist, examined Plaintiff on behalf of the Massachusetts Department of Children and Families to assess her parenting capacity. (R.

1256-70). He diagnosed Plaintiff with PTSD and dependent personality disorder. (R. 1286-87).

Dr. Andrews opined that Plaintiff was capable of average performance with respect to cognitive

functioning. (R. 1284). She had "extremely high elevations" on the Traumatic Stress and Stress

scales, as well as "moderate elevations" on the Depression, Depression and Paranoia Scales. (R.

1285). These scores were likely attributable to the domestic abuse she has experienced. *Id.* With

respect to her parenting capacities, Dr. Andrews found no evidence that Plaintiff would be

unable to provide adequate food, clothing, and shelter for herself and her daughter, or that her

mental illness would interfere with her ability to provide adequate care. (R. 1286). Plaintiff's

GAF score was 60, and Dr. Andrews opined that Plaintiff could become fit to regain custody of

her daughter if she became involved in weekly therapy for adult survivors of abuse, remained in

close contact with the Department of Children and Families, considered anxiolytic or

antidepressant medication, and participated in family therapy. (R. 1289-90).

*Opinion of Dayna Anderson, M.D.*

On November 22, 2011, Dr. Anderson completed a multiple impairment questionnaire in

which she provided her medical opinion about the severity of Plaintiff's symptoms and

functional limitations. (R. 892). Plaintiff was diagnosed with depression, PTSD and

fibromyalgia, with symptoms of fatigue, joint and muscle pain, depression and anxiety. (R. 892-

93). Dr. Anderson rated the severity of Plaintiff's pain as a 7 out of 10 , and fatigue as a 10 out of

10. (R. 894). In response to questions regarding Plaintiff's functional capacity in a normal work

environment, Dr. Anderson opined that Plaintiff could sit for only two hours per day, stand for

two hours per day, occasionally lift 10-20 pounds and occasionally carry 5-10 pounds. (R. 894-

95). Dr. Anderson further stated that Plaintiff experiences constant difficulties with attention and

concentration, and is incapable of handling even low work stress. (R. 897).

*Opinion of Jonathan Burns, M.D.*

Dr. Burns completed a multiple impairment questionnaire on March 2, 2012. (R. 1433-40). Plaintiff was diagnosed with fibromyalgia, depression and PTSD, which causes depression and chronic pain in her lower back and joints. (R. 1433). Dr. Burns opined that Plaintiff's pain was a 7 or 8 out of 10, and her fatigue was 10 out of 10. (R. 1435). Plaintiff would be able to sit for only two hours during a regular workday, and stand or walk for less than one hour. *Id.* She could occasionally lift and carry 0-5 pounds, but nothing more. (R. 1436). Dr. Burns stated that Plaintiff would have no more than moderate difficulties in using her fingers, hands and arms, and that Plaintiff's symptoms are severe enough to constantly interfere with her attention and concentration. (R. 1436-38). Dr. Burns also opined that Plaintiff can only tolerate low work stress and would be absent from work more than three times per month. (R. 1438-39).

*Opinion of Sharon Salter, M.D.*

Dr. Salter completed a psychiatric impairment questionnaire on March 6, 2012. (R. 1443-49). Plaintiff was diagnosed with anxiety, depression and PTSD, with primary symptoms of depression, low energy, staying in bed, isolating, and lack of interest. (R. 1443-44). In response to questions about Plaintiff's capacity to sustain mental activity over a normal work schedule, Dr. Salter opined that Plaintiff's ability to understand and remember work procedures and instructions was no more than moderately limited. (R. 1446). Plaintiff's ability to sustain concentration and persistence was also no more than moderately limited, except Dr. Salter stated that Plaintiff was markedly limited in her ability to complete a normal workweek without interruptions from her psychologically based symptoms. (R. 1446-47). With respect to social interactions, Dr. Salter stated that Plaintiff was markedly limited in her ability to interact with the general public, work supervisors, and co-workers. (R. 1447). Although markedly limited in her

ability to travel to unfamiliar places, Dr. Salter opined that Plaintiff was otherwise no more than moderately limited when it comes to adapting to changes generally. (R. 1447-48). Dr. Salter also opined that Plaintiff is likely to be absent from work as a result of her impairments more than three times per month, and is incapable of even low work stress. (R. 1449-50).

*Opinion of M.A. Gopal, M.D.*

On March 8, 2012 Dr. M.A. Gopal completed an examination of Plaintiff's medical records as a state agency medical consultant. (R. 168-189). Dr. Gopal found that Plaintiff's affective and anxiety-related disorders did not cause any restriction in her activities of daily living, and only mild restrictions on her ability to function socially and maintain concentration, persistence and pace. (R. 174). With respect to her exertional limitations, Dr. Gopal opined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or sit for 6 hours in an 8-hour work day, and is unlimited in her ability to push and pull. (R. 175-76). Although Dr. Gopal noted that Plaintiff has fibromyalgia with chronic body aches and joint pain, the assessment noted that she does not have postural, manipulative, visual, communicative or environmental limitations, and concluded that she can perform light work. (R. 176).[3]

*Opinion of Rachel Vogel, M.D.*

Dr. Vogel completed a multiple impairment questionnaire on June 18, 2013. (R. 1415-22). Plaintiff was diagnosed with severe depression, anxiety, PTSD, fibromyalgia and chronic hip and lower back arthritis, causing symptoms of lower back pain, bilateral groin and hand pain, fatigue, constant anxiety, and low motivation. (R. 1415-16). Dr. Vogel rated Plaintiff's pain as ranging from 3 to 10 on a scale of 10, and fatigue as a 7. (R. 1417). She opined that Plaintiff would be unable to sit, stand or walk for more than an hour during a regular work day, and that

---

[3] Plaintiff's records were reconsidered by a second state agency consultant on July 18, 2012. Dr. Robin McFee confirmed the findings of Dr. Gopal, but found that Plaintiff had additional manipulative and environmental restrictions. (R. 200-02, 213-15).

Plaintiff could occasionally lift and carry 5-10 pounds, but no more. (R. 1417-18). Dr. Vogel further observed that Plaintiff was markedly limited in her ability to use her upper extremities during a normal workday, and could not engage in any pushing, pulling, kneeling, bending or stooping. (R. 1418-19, 1421). Plaintiff's symptoms were reported to be severe enough to constantly interfere with her attention and concentration. (R. 1420). Dr. Vogel also remarked that Plaintiff would require a ten-minute break every hour during a normal 8-hour work day, and she would likely miss work more than three times per month as a result of her impairments. (R. 1420-21).

*Opinion of Maria Pizzimenti*

On June 21, 2013, domestic violence advocate Maria Pizzimenti completed a psychiatric/psychological impairment questionnaire. (R. 1423-30). Ms. Pizzimenti, who had worked with Plaintiff at an organization called Reach Beyond Domestic Violence, described Plaintiff's primary symptoms as depression, fatigue, isolation, poor socialization, and anxiety attacks. (R. 1425). Ms. Pizzimenti noted that Plaintiff was generally no more than moderately limited in her capacity for sustained concentration or persistence, except that she was markedly limited when it came to her ability to stick to a schedule, maintain regular attendance, be punctual, and complete a full, normal workweek without interruption. (R. 1426-27). Ms. Pizzimenti further expressed the opinion that Plaintiff has marked limitations on her ability to interact socially and adapt to changes in the work setting. (R. 1427-28). Finally, Ms. Pizzimenti opined that Plaintiff would be incapable of even low work stress, and would likely be absent from work more than three times per month due to her impairments. (R. 1429-30).

*Hearing Testimony*

Plaintiff appeared before ALJ Paul Carter on July 23, 2013, in Boston, Massachusetts, and was represented by Carolyn Costello, a non-attorney representative. (R. 60). After answering questions about her background and past relevant work, Plaintiff testified that her anxiety is the most serious condition that prevents her from working. (R. 71). Plaintiff stated that she also has difficulty sleeping, which causes constant fatigue, as well as arthritis in her hands, hips and back that requires physical therapy twice a week. (R. 71-72).

Plaintiff explained that she was currently seeing a psychiatrist named Dr. Winters, and that she previously saw Dr. Salter. (R. 72-73). On "bad days," which occur 4-5 days per week, Plaintiff cannot bring herself to get out of bed and spends almost the entire day in her room. (R. 74-75, 82). When she goes to the grocery store or laundromat she is always accompanied by her boyfriend, because she feels she cannot go alone. (R. 74-75). She doesn't like crowds and distrusts people, especially men. (R. 83). Plaintiff testified that her psychological symptoms can be triggered very easily, and that she doesn't believe she could deal with coworkers or show up to a workplace five days per week. (R. 83-84). She explained that during her last job, she often couldn't motivate herself to do her work. (R. 84).

In response to questions from the ALJ about her sleeping difficulties, Plaintiff described how she tries to go to bed around 8:00 or 9:00 PM, but usually wakes by 1:00 AM and watches television throughout the night. (R. 74). Plaintiff testified that she only has one alcoholic drink per week, which was a significant change from the previous year when she was drinking two to three liters of hard liquor per week. (R. 73-74). Plaintiff explained that she drank heavily for about two or two and a half years "to cope with . . . the issues with my daughter," but that she

now only drinks moderately. (R. 74). Plaintiff's fifteen year-old daughter is in the custody of her ex-husband's sister, and Plaintiff sees her daughter once a month. (R. 80-81).

With respect to her physical symptoms, Plaintiff testified that she can only walk a quarter of a mile, or "a couple blocks," before her back begins to hurt, due to a motorcycle accident in 2010. (R. 68, 76-77). Her back had become increasingly painful in the past six months, to the point where she could only stand for about 10-15 minutes and sit for 30-45 minutes. (R. 77-78). She further stated that she can only lift about five pounds, doesn't bend over well anymore, and has difficulty walking up stairs. (R. 79-80).

The ALJ also took testimony from vocational expert James Scorzelli, Ph.D. Dr. Scorzelli testified that Plaintiff had past relevant work as a licensed, registered nurse, a medium skill job. (R. 87-88). Conceding that Plaintiff could not perform her past work, the ALJ inquired whether there are jobs in significant numbers for an individual who could perform light work, with the additional limitations of "performing only simple, repetitive tasks not working in tandem with coworkers and just having basic, momentary, casual contact, . . . withstand[ing] an average amount of stress." (R. 89). In response, Dr. Scorzelli testified that such an individual could be a mail clerk (5,600 mail clerks in Massachusetts and 20,000 nationwide), light housekeeper (45,000 in Massachusetts and 900,000 nationwide) or a gluer (550 in Massachusetts and 3,000 nationwide). (R. 90). Dr. Scorzelli also stated that because all of these jobs involve private employers, the individual could miss no more than eight days of work per year. *Id.* He further testified that if the person were to be off-task for more than 20 percent of the work day, or if they required more than two fifteen-minute breaks and a lunch break due to their inability to get back to work, the person would be unemployable. (R. 91).

*The ALJ's Findings*

To be found eligible for either disability insurance benefits or supplemental security income, an applicant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423 (d)(1)(A); 1382c (3)(A).[4] The Commissioner uses a five-step evaluation process to determine whether an applicant meets this standard. 20 C.F.R. §§ 404.1520 (a)(4); 416.920(a)(4). At step one, the Commissioner decides whether the applicant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520 (a)(4)(i); 416.920(a)(4)(i). If not, the Commissioner proceeds to step two. Step two requires the Commissioner to determine whether the applicant's impairment is "severe." 20 C.F.R. § 404.1520 (a)(4)(ii); 416.920(a)(4)(ii).

If the claimant establishes that the impairment is severe, the Commissioner proceeds to step three and determines whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1. 20 C.F.R. § 404.1520 (a)(4)(iii); 416.920(a)(4)(iii). If so, the claimant is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287 (1987). If not, the Commissioner proceeds to step four. Step four asks whether the applicant's residual functional capacity (RFC) allows her to perform her past relevant work. 20 C.F.R. § 404.1520 (a)(4)(iv); 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled. If the claimant is unable to perform past relevant work, the burden shifts to the Commissioner on the fifth step to

---

[4] For a disability insurance benefits claim, a claimant must establish disability on or before the date last insured to be entitled to benefits. *See Cruz Rivera v. Sec'y of Health & Human Servs.*, 818 F.2d 96, 97 (1st Cir. 1986). The ALJ determined that, based on Plaintiff's earnings record, Plaintiff "meets the insured status requirements of the Social Security Act through March 31, 2014." (R. 14).

prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." *Bowen*, 482 U.S. at 142, 107 S.Ct. 2287. If the Commissioner fails to meet this burden, the claimant is disabled and entitled to benefits. *Id.*

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 1, 2009. (R. 34). At step two, the ALJ found that Plaintiff had severe impairments of PTSD, depression, anxiety and arthritis. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In reaching this conclusion, the ALJ considered listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders), including whether "paragraph B" and "paragraph C" criteria were satisfied. *Id.*

Evaluating the paragraph B criteria for each listing,[5] the ALJ determined that Plaintiff experienced only moderate difficulties in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace. (R. 36). Further, the ALJ found that Plaintiff had experienced no episodes of decompensation which had been of extended duration. *Id.* Evaluating the paragraph C criteria for listing 12.04,[6] the ALJ found no evidence to show that Plaintiff: (1) had experienced repeated episodes of decompensation of extended duration; (2)

---

[5] Paragraph B criteria are met when the claimant's disorder(s) result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1. "Marked" difficulty means difficulty that is "more than moderate but less than extreme." *Id.*

[6] For listing 12.04 (affective disorders), paragraph C criteria are satisfied if the claimant has a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § 404, Subpt. P, App. 1.

had experienced a residual disease process resulting in such marginal adjustment that even a

minimal increase in mental demands or change in environment would be predicted to cause

Plaintiff to decompensate; or (3) had a current history of one or more years' inability to function

outside a highly supportive living arrangement with indication of continued need for such an

arrangement. (R. 36-37). For listing 12.06,[7] the ALJ found the paragraph C criteria not satisfied

because the record did not support a finding that Plaintiff had a complete inability to function

independently outside the home. (R. 37). Therefore, the ALJ found that Plaintiff's severe

impairments did not meet or equal a listed impairment and proceeded to step four.

At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in

20 C.F.R. 404.1567(b) and 416.967(b),[8] with the following additional restrictions:

> [Plaintiff] is limited to the performance of only simple, repetitive tasks. She can have
> basic, casual contact with coworkers and is not able to perform tandem work. She can
> have basic, momentary, casual contact with the public, but should have no contact where
> providing or receiving instructions or information is required.

(R. 37). In making this determination, the ALJ found that Plaintiff's subjective descriptions of

her symptoms were not fully credible in light of other objective medical evidence in the record.

(R. 48-49). Further, the ALJ had "difficulty giving significant weight" to the opinions of Dr.

Anderson, Dr. Burns, and Dr. Vogel. (R. 49). The ALJ gave "great weight" to the opinion of Dr.

---

[7] For listing 12.06 (anxiety-related disorders), paragraph C criteria are satisfied if the claimant's anxiety-related
disorder "result[s] in complete inability to function independently outside the area of one's home." *Id.*

[8] SSA regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
> weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing
> and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light
> work, you must have the ability to do substantially all of these activities. If someone can do light work, we
> determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss
> of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Gopal and the evaluation by Dr. Andrews, "limited weight" to the opinion of Dr. Salter, and "little weight" to the assessment by Maria Pizzimenti. *Id.*

Given Plaintiff's RFC, the ALJ found that Plaintiff was unable to perform any past relevant work. *Id.* At step five, however, the ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. 51). This conclusion was based on testimony by the vocational expert that, given the additional restrictions on Plaintiff's ability to perform light work, she could still perform the requirements of jobs such as mail clerk, light housekeeper, and gluer. (R. 51-52). Therefore, Plaintiff was not disabled. (R. 52).

## Discussion

Plaintiff asserts that the ALJ's decision should be reversed for three reasons: the ALJ improperly weighed the medical opinion evidence; the ALJ improperly evaluated Plaintiff's credibility; and the ALJ improperly relied on flawed vocational expert testimony.

### Standard of Review

Review by this Court is limited to whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *Manso-Pizarro v. Sec'y of Heath & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

Reversal of an ALJ's decision by this Court is warranted only if the ALJ made a legal error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro*, 76 F.3d at 16. If the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different conclusion. *See Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

## *The ALJ's evaluation of medical opinion evidence*

Plaintiff first argues that in determining Plaintiff's RFC, the ALJ improperly weighed the medical opinions of Plaintiff's treating sources and the non-examining state agency consultant.

### *Treating Source Opinions*

An ALJ must "always consider the medical opinions in [the] case record," 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources. *See* 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1) (stating that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"). The treating source rule provides that the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2). Controlling weight will be given to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id.*[9]

In certain circumstances, however, the ALJ does not have to give a treating physician's opinion controlling weight. *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) (observing that "[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians"). The regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians. *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4); 416.927(c)(2)-(4); *see also* SSR 96-2p, 1996 WL 374188, at *2. Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

With respect to the treating source opinions, Plaintiff asserts that the ALJ improperly evaluated the questionnaires submitted by (1) Plaintiff's primary care physicians; and (2) Plaintiff's psychiatrist.

---

[9] "Controlling weight" is the term used to describe a medical opinion from a treating source that *must* be adopted by the ALJ. *See* SSR 96-2p, 1996 WL 374188, at *2.

(1) <u>Treating physician opinions</u>

The ALJ "ha[d] difficulty giving significant weight" to the opinions of Dr. Anderson, Dr. Burns, and Dr. Vogel regarding Plaintiff's physical limitations. (R. 49). In support of this conclusion, the written decision recounts the records from Plaintiff's visits with each of her primary care physicians. (R. 37-49). The ALJ found that the symptoms reported by Dr. Anderson were inconsistent with her own treatment records, which suggested that Plaintiff's physical pain was relieved with medication. (R. 49). Similarly, the ALJ discounted the opinion of Dr. Burns because "nothing in [the] treatment records supports" the functional limitations he described in the impairment questionnaire. *Id.* The ALJ found Dr. Vogel's assessment of Plaintiff's limitations due to arthritis undermined by the fact that Vogel's treatment notes do not contain references to Plaintiff experiencing severe arthritic pain. *Id.* Further, the decision casts doubt on Dr. Vogel's opinion that Plaintiff experienced limitations due to back pain, insomnia, and depression prior to 2004, because Plaintiff had excellent earnings records through 2007. (R. 48).

Plaintiff raises two objections to the ALJ's treatment of these opinions. First, Plaintiff asserts that the physicians' treatment notes are not inconsistent with their opinions of Plaintiff's severe physical limitations, and therefore should have been given controlling weight pursuant to 20 C.F.R. § 404.1527(c)(2) and 416.927(c)(2). Second, Plaintiff contends that even if the ALJ did not err by failing to give the physician opinions controlling weight, the ALJ failed to consider the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 416.927(c)(2)-(6). Both arguments fail.

First, the ALJ did not improperly evaluate the physicians' treatment notes. To be sure, treatment records are not always reliable indicators of a claimant's functional limitations, due to "the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate

opinion on the claimant's ability to work." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *see also Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) (stating that "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations"). In this case, however, there is a steady, significant disconnect between Plaintiff's symptoms as described in the records and the limitations described in the primary care physicians' impairment questionnaires. Pursuant to SSA regulations, such inconsistency permits the ALJ to discount the treating physician opinions.

For example, Dr. Vogel opined that Plaintiff's hand arthritis causes marked limitations in her ability to grasp, turn, and twist objects, and use her fingers. (R. 1418). However, in a function report completed in 2011 by Plaintiff herself, she indicated that her impairments did not affect her ability to use her hands. (R. 351). In 2012 Plaintiff reported that she plays pool, (R. 706), and in 2013 told Dr. Vogel that she enjoys bowling. (R. 95). Although the treatment records often reference Plaintiff's arthritis and fibromyalgia, her pain was consistently well-managed with medication and almost never her chief complaint. (R. 938, 943, 945-46, 949, 951-52, 955-56, 1340-42). Based on the entirety of the medical records, treatment notes, and Plaintiff's descriptions of her physical activities, it was not unreasonable for the ALJ to infer that the questionnaires submitted by her treating physicians exaggerated the extent of her physical limitations. Where, as here, treating source opinions are inconsistent with other substantial evidence in the record, the SSA regulations do not require an ALJ to give the opinions controlling weight. *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(3), (4); 416.927(c)(3), (4); *see also* SSR 96-2p, 1996 WL 374188, at *2.

Plaintiff's second objection to the ALJ's evaluation of the treating source opinions—that the ALJ failed to consider the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 416.927(c)(2)-(6)—is no more persuasive. As described above, the ALJ's discussion of Plaintiff's treatment notes and other evidence in the record explicitly considers factors (c)(3) and (c)(4): the degree to which the opinion is supported by relevant evidence and the consistency of the opinion with the record as a whole. The decision also describes Plaintiff's medical treatment history in considerable detail, including details of individual appointments with Dr. Anderson, Dr. Burns, and Dr. Vogel dating back to at least 2009. (R. 38-46). Implicit in this description is the ALJ's consideration of the remaining factors: the treatment relationship between the claimant and the physician, the practice specialty of the physician, and "other" relevant factors. 20 C.F.R. § 404.1527(c)(2), (5), (6); 416.927(c)(2), (5), (6).

Furthermore, the regulations do not require an ALJ to expressly state how each factor was considered, only that the decision provide "good reasons" for the weight given to a treating source opinion. 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2). The ALJ provided specific reasons, supported by evidence in the case record, for his decision to discount each of the opinions of Dr. Anderson, Dr. Burns, and Dr. Vogel. The reasoning is sufficiently specific to inform both the claimant and this reviewing Court of how each treating source opinion was evaluated. Remand is not required where, as here, "it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule." *Botta v. Barnhart*, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

(2) <u>Treating psychiatrist opinion</u>

The ALJ gave "limited weight" to the questionnaire submitted by Dr. Salter, Plaintiff's treating psychiatrist. Dr. Salter opined that Plaintiff is markedly limited in her ability to interact with others and travel to unfamiliar places, and is likely to be absent more than three times per month from work. (R. 1446-50). The ALJ discounted Dr. Salter's opinion because he found it inconsistent with Dr. Salter's own treatment notes and other evidence regarding Plaintiff's activities. (R. 50). Specifically, the ALJ found it significant that Dr. Salter had consistently given Plaintiff GAF scores of 50-65, indicating Plaintiff's general ability to function. *Id.* Further, the ALJ noted that Plaintiff consistently appeared well at her appointments, her depression and anxiety symptoms appeared to be situational, and she exhibited an ability to participate in activities when she wanted to. *Id.*

Plaintiff's primary objection to the weighing of Dr. Salter's opinion is based on the ALJ's reliance on GAF scores. The GAF scale provides a "'rough estimate' of an individual's psychological, social, and occupational functioning." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). However, it has recently fallen into disfavor as an assessment tool. As Plaintiff points out, "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association ("APA")] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Kroh v. Colvin*, No. 13-CV-01533, 2014 WL 4384675, *17 (M.D. Penn. Sept. 4, 2014). As a result of the concerns identified by the APA, the SSA published Administrative Memorandum AM-13066 to guide adjudicators on how to consider GAF ratings. *See Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D. R.I. 2014). The memorandum, dated July 22, 2013, indicates that the SSA will continue to receive and consider GAF scores just as it would

25

other opinion evidence, but scores must have supporting evidence to be given significant weight.

*Kroh*, 2014 WL 4384675, at \*18. The memorandum explains:

> By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*Lane v. Colvin*, No. C13-5658-MJP, 2014 WL 1912065, \*9 (W.D. May 12, 2014) (quoting AM-13066). Further, the subjective nature of the ratings means that "adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation." *Hall*, 18 F. Supp. 3d at 154 (quoting AM-13066).

Despite the significant concerns about the reliability of the GAF scale that the SSA itself has acknowledged, the ALJ's reliance on the scores in this case was not in error. Review of Dr. Salter's records makes clear that she carefully selected and adjusted Plaintiff's scores at each appointment. (R. 674-709). Dr. Salter met with Plaintiff once a month for almost two years, and the treatment notes describing Plaintiff's mood, energy, and complaints at each visit correspond with fluctuations in the GAF scores. The ALJ's use of the GAF scale did not involve any inferences drawn from ratings assigned by different clinicians, nor did the ALJ consider a single score in isolation. Dr. Salter recorded a range of scores over many months, thereby creating a more reliable longitudinal picture of Plaintiff's functionality than might be the case for other claimants. Thus, the concerns about the GAF scale identified by the APA are not implicated to the same extent, and the ALJ was permitted to consider Plaintiff's scores—at least as *some* evidence—in discounting Dr. Salter's opinion. *See Gonzalez-Rodriguez v. Barnhart*, 111 F. App'x 23, 25 (1st Cir. 2004) (noting that the GAF system provides a helpful scale for ALJs and other lay persons to understand an individual's mental functioning).

Furthermore, the ALJ relied on other supporting evidence for Plaintiff's ability to function in spite of her mental impairments. This evidence included Dr. Salter's notes that Plaintiff consistently appeared well, responded well to medication, and appeared to have symptoms related to situational stress. (R. 50). The ALJ also noted that despite Plaintiff's contention that she was unable to get out of bed, the record showed that she was able to go out with her boyfriend, play pool, visit her daughter, breed birds and go shopping. *Id.* Finally, the ALJ cited the parenting evaluation by Dr. Andrews, which supported the conclusion that Plaintiff could perform some unskilled work. *Id.* Plaintiff does not contest the existence or veracity of this evidence, but merely its significance vis-à-vis other conflicting evidence.[10] But is the responsibility of the ALJ, not this Court, to resolve conflicts in the evidence and draw reasonable inferences from the record. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Therefore, the ALJ did not err in discounting Dr. Salter's opinion of Plaintiff's mental impairments.[11]

*Non-Examining State Agency Consultant Opinion*

Plaintiff also challenges the "great weight" given to the evaluation by Dr. M.A. Gopal, the state agency medical consultant. Dr. Gopal assessed Plaintiff's physical RFC, and found that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or sit for 6 hours in an 8-hour work day, and was unlimited in her ability to push and pull. (R. 175-76).

---

[10] In a footnote, Plaintiff asserts that Dr. Salter's opinions are also supported by the questionnaire submitted by Maria Pizzimenti, which the ALJ gave "very little weight" because Ms. Pizzimenti's qualifications were unknown. (R. 50). Plaintiff suggests that this was error, because it violated the ALJ's duty to "make 'every reasonable effort' to recontact the [treating] source for clarification of the reasons for the opinion." SSR 96-5P, 1996 WL 374183, *6. However, a breach in the duty to recontact is not reversible error where the record is otherwise adequate for the ALJ to draw a reasonable conclusion regarding the extent of Plaintiff's impairments. *See Ribeiro v. Barnhart*, 149 F. App'x 7, 8 (1st Cir. 2005). As in *Ribeiro*, the record of Plaintiff's impairments was not undeveloped, and "the ALJ could reasonably conclude that requesting [Ms. Pizzimenti's qualifications] would have provided little insight." *Id.*

[11] For the same reasons, the ALJ did not err in discounting the questionnaires submitted by Plaintiff's primary care physicians, to the extent they included opinions regarding Plaintiff's mental impairments.

In assigning Dr. Gopal's assessment great weight, the ALJ noted that it was "consistent with the medical evidence as a whole." (R. 49).

"[T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert." *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994) (internal quotations omitted). The First Circuit has held that an RFC assessment of a non-examining medical advisor, when based on review of evaluations by a claimant's treating sources, may constitute substantial evidence to support a finding of non-disability. *Rodriguez v. Sec'y of Health & Human Servs.*, 893 F.2d 401, 403 (1st Cir. 1989). Further, SSA regulations specifically provide that in appropriate circumstances, "opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, *3.

Plaintiff argues that Dr. Gopal's assessment should not have been credited because it failed to indicate what records were reviewed in determining Plaintiff's physical RFC. Plaintiff further asserts that governing regulations state that the *only* circumstance in which a non-examining source may outweigh treating source opinions is when the non-examining source reviews a complete case record that includes a medical report from a specialist. The Court rejects these arguments, because they mischaracterize both the record and the governing law. Contrary to Plaintiff's assertion, Dr. Gopal's assessment lists the "evidence of record" received, including records from the Union Square Family Health Center, Newton-Wellesley Department of Psychiatry, Plaintiff herself, and Plaintiff's attorney. (R. 169-172, 180-183). Under "Findings of

Fact and Analysis of Evidence," the assessment plainly states that Dr. Gopal reviewed the medical evidence submitted by Newton-Wellesley and Union Square. (R. 173, 184).

Further, it is simply not true that the *only* time a non-examining source may be granted greater weight than a treating source is when a complete record, including a medical report from a specialist, has been reviewed. Social Security Ruling 96-6p, which Plaintiff cites for the proposition, lists that circumstance as one, non-exclusive *example* of when it would be appropriate to assign greater weight to the opinion of a state agency consultant.[12] *See* SSR 96-6p, 1996 WL 374180, *3. Plaintiff advances no other rationale for the assertion that the ALJ erred by assigning Dr. Gopal's assessment "great weight," and the Court is aware of none. Consequently, the ALJ's decision will not be reversed on this ground.

<u>*The ALJ's evaluation of Plaintiff's credibility*</u>

Plaintiff next argues that the ALJ made an erroneous determination of Plaintiff's credibility. Once it is found that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including statements from the claimant. 20 C.F.R. § 404.1529(c)(1); 416.929(c)(1). However, a claimant's subjective description of symptoms alone cannot establish disability; the ALJ must also consider any other available evidence, including the objective medical evidence, to determine whether the claimant's testimony is consistent with the remainder of the record. 20 C.F.R. § 404.1529(a), (c); 416.929(a), (c). Evaluating the entire record in this manner requires the ALJ to make a finding about the credibility of a claimant's statements. SSR 96-7p, 1996 WL 374186 at *1. The ALJ's credibility

---

[12] Nor was it error, as Plaintiff suggests, for the ALJ to credit Dr. Gopal's assessment in spite of the fact that he is not a specialist. Plaintiff cites no authority for that proposition, and SSA regulations merely list specialization as one factor that adjudicators consider in weighing medical opinions. *See* 20 C.F.R. § 404.1527(c)(5); 416.927(c)(5).

determination "is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

Social Security Ruling 96-7p explains how an ALJ must evaluate a claimant's credibility under the regulations. *See* SSR 96-7p, 1996 WL 374186. The ruling requires an ALJ to consider a claimant's statements in light of the entire record, and to include in the decision specific reasons for the credibility finding that are supported by evidence. *Id.* at *2-4. Specifically, an adjudicator must consider the following factors when evaluating the nature and severity of a claimant's symptoms:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 1529(c)(3); 416.929(c)(3); SSR 96-7p, 1996 WL 374186 at *3; *see also Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986) (describing factors ALJs must consider in evaluating a claimant's subjective description of pain). In this case, the 20-page written decision thoroughly recounts Plaintiff's medical records and testimony, and the ALJ carefully weighed evidence regarding the nature and severity of Plaintiff's symptoms in light of the *Avery* factors. Plaintiff objects, however, to the credibility determinations regarding Plaintiff's mental impairments, ability to work, and her physical impairments.

With respect to the mental impairments, Plaintiff argues that the ALJ erred by not citing evidence for the conclusion that Plaintiff was exaggerating her symptoms. This contention is unfounded. In finding that Plaintiff "is clearly able to function well when she wants to," the ALJ specifically relied on Dr. Andrews' positive assessment of Plaintiff's potential as a parent, (R.

48-49), and the fact that she was consistently able to attend appointments in order to get medication refills. (R. 49). This constitutes "more than a scintilla" of evidence to support the credibility determination. *See R & B Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd.*, 618 F.3d 37, 44 (1st Cir. 2010).

Substantial evidence also supports the ALJ's finding that Plaintiff's statements about her ability to work were not fully credible. In support of this conclusion, the ALJ noted that Plaintiff testified that she stopped working when she moved, not because of her impairments. (R. 48). The ALJ further observed that Plaintiff continued to look for work for several years, and was even hired for jobs in 2010 and 2011 that ultimately did not work out. *Id.* The ALJ also found significant the fact that Plaintiff attributed difficulties in previous jobs to issues with her abusive ex-husband, a situation that appeared to be resolved. *Id.* Finally, the ALJ noted that Dr. Vogel reported that Plaintiff's physical and mental limitations began in 2004, but Plaintiff continued to have excellent earnings through 2007. *Id.* This suggested to the ALJ that Plaintiff was able to work despite her impairments. *Id.* All of these facts are found in the record. (R. 84-85, 678-79, 688, 316).

With respect to her physical impairments, the ALJ acknowledged that Plaintiff has arthritis in her toes, hands, hips, and spine, but concluded that the record did not support her subjective descriptions of the severity of her pain. (R. 48). The ALJ noted that Plaintiff consistently told her providers that the pain was well-controlled with Tramadol, and that she had not reported worsening symptoms or any difficulties using her hands. *Id.* Further, the ALJ cited the fact that Plaintiff had often reported engaging in activities such as walking, going to the beach, playing pool, grocery shopping, and going to the laundromat. *Id.* Again, all of these facts

are found in the record, and constitute substantial evidence supporting the ALJ's credibility determination. (R. 75, 98, 104, 678, 706, 915, 918, 941, 946, 951, 1359, 1361).

Nonetheless, Plaintiff urges the Court to reverse the findings of the ALJ in light of the First Circuit's decision in *Johnson v. Astrue*, 597 F.3d 409 (1st Cir. 2010). In *Johnson*, the First Circuit reversed a credibility determination where the ALJ relied on the fact that the claimant's fibromyalgia did not preclude her from engaging in "light housework, meal preparation, and driving short distances." *Id.* at 414. The First Circuit found that this evidence was not sufficient to discredit the claimant's descriptions of disabling pain for two reasons. *Id.* First, the fact that the claimant could engage in light chores was not inconsistent with other evidence suggesting that during a normal workday she could sit for four hours and walk and stand for one hour. *Id.* Second, there were no medical records discrediting the claimant's complaints of disabling pain. *Id.* Consequently, the First Circuit found the ALJ's credibility determination to be unsupported by substantial evidence. *Id.*

Neither of those circumstances is present here. Going to the beach and playing pool and darts involve more significant physical activity than the "light housework" the court found unpersuasive in *Johnson*. These activities involve more bending, squatting, lifting, and carrying than light housework, and therefore go further in discrediting Plaintiff's description of her symptoms.[13] It is not unreasonable to infer that Plaintiff's capacity to engage in these recreational activities is inconsistent with her testimony that she can only walk a couple blocks, stand for only 10-15 minutes, and lift only five pounds. (R. 77). Further, unlike the medical evidence in *Johnson*, Plaintiff's records from Union Square Health Center are replete with indications that her fibromyalgia pain was being managed well, or even improving, with the use of Tramadol. (R. 915, 918, 941, 946, 951). Thus, *Johnson* does not control the result in this case.

---

[13] Indeed, as recently as April 2013, Plaintiff reported that she enjoys bowling. (R. 95).

Plaintiff presents a compelling argument that substantial evidence supports her descriptions of pain and functional limitations. While that may be true, the fact that the ALJ *could have* credited her statements is not grounds for reversal. *See Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987) (stating that an ALJ's decision must be affirmed if supported by substantial evidence, "even if the record arguably could justify a different conclusion"). Once again, it is the responsibility of the ALJ, not this Court, to resolve conflicts in the evidence and draw reasonable inferences from the record. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). The Court finds that the determination on Plaintiff's credibility is supported by substantial evidence. Therefore, the ALJ's credibility determination will be affirmed.

### *The ALJ's reliance on vocational expert testimony*

Plaintiff's final argument is that the ALJ relied on flawed vocational expert testimony in concluding that Plaintiff could perform jobs that exist in significant numbers in the national economy. For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments. *See Arocho v. Sec'y. of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir. 1982); *Cohen v. Astrue*, 851 F. Supp. 2d 277, 284 (D. Mass. 2012). Where a hypothetical omits "any mention of a [claimant's] significant functional limitation" that is supported by the medical evidence, an ALJ cannot rely on the vocational expert's response. *Rose v. Shalala*, 34 F.3d 13, 19 (1st Cir. 1994). Simply put, "the hypothetical posed to a [vocational] expert must include all of the claimant's relevant impairments." *Aho v. Comm'r of Soc. Sec. Admin.*, No. 10-CV-40052-FDS, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011); *see also Cohen v. Astrue*, 851 F. Supp. 2d 277, 285-87 (D. Mass.

2012) (remanding where hypothetical posed to vocational expert omitted the ALJ's finding of moderate restrictions of concentration, persistence, and pace.)

Plaintiff asserts that the ALJ's hypothetical failed to accurately describe all of Plaintiff's mental limitations.[14] Specifically, Plaintiff argues that the ALJ omitted from the hypothetical the finding that Plaintiff has "moderate difficulties with concentration, persistence, or pace," and instead stated only that Plaintiff was mentally restricted to simple, repetitive tasks. This argument again mischaracterizes the record. The full text of the ALJ's hypothetical, as it pertains to Plaintiff's mental limitations, reads:

> Within the light range of work she has nine virtual limitations of anxiety, depression, and she experiences pain. **The nature of the anxiety, depression, and pain will have an effect on her concentration at times, her memory, her ability to attend to task, to follow instructions, and to conform to changes to a work environment.** As a result, to compensate she is limited to performing simple, repetitive tasks only. She is not capable of performing complex tasks on a sustained basis.

(emphasis added) (R. 88). The emphasized sentence makes plain that the hypothetical did not, as Plaintiff argues, "only assume[] that [Plaintiff] was mentally restricted to simple, repetitive tasks." Pl.'s Mem., Docket No. 12, at 29. Further, the hypothetical adequately refers to limitations in "concentration, persistence or pace," despite the fact that the verbatim phrase does not appear. "Concentration, persistence, or pace" is defined by SSA regulations as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The hypothetical clearly refers to an individual's ability to sustain concentration and complete tasks during the workday. Consequently, this case is different from *Viveiros v. Astrue* and *Cohen v. Astrue*, where Judge Casper and Judge Young found hypotheticals to be defective for omitting *any* mention

---

[14] Plaintiff also argues that the vocational expert's testimony was flawed because it was elicited on the basis of a flawed RFC. For the reasons set forth above, the Court has concluded that the ALJ's RFC determination was supported by substantial evidence and therefore rejects this argument as it applies to the vocational expert testimony.

of the claimant's limitations in concentration, persistence or pace. *See* No. 10-CV-11902-DJC, 2012 WL 4104794, *8 (D. Mass. Sept. 19, 2012); 851 F. Supp. 2d 277, 285-86 (D. Mass. 2012).

Nor was it reversible error that the ALJ omitted the term "moderate" from the hypothetical. Because the hypothetical catalogs several different ways in which limitations in concentration, persistence, or pace would affect an individual in a normal work environment, the Court finds it that it adequately conveyed moderate limitations.[15] Therefore, the Court finds that the ALJ's hypothetical was not defective.

## Conclusion

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings (Docket No. 11) is ***denied*** and Defendant's Motion for Order Affirming the Commissioner's Decision (Docket No. 15) is ***granted***.


SO ORDERED.


/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE

---

[15] SSA regulations do not define "moderate," but provide that it is the middle rating on a five-point scale used to describe the severity of a claimant's functional limitations. *See* 20 C.F.R. § 404.1520a; 416.920a. The scale includes ratings of "[n]one, mild, moderate, marked and extreme." *Id.*